UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| LOPAREX, LLC, | ) | |
|     *Plaintiff*, | ) | |
| | ) | |
| *vs.* | ) | 1:09-cv-01411-JMS-TAB |
| | ) | |
| MPI RELEASE TECHNOLOGIES, LLC, GERALD | ) | |
| KERBER, and STEPHAN ODDERS, | ) | |
|     *Defendants*. | ) | |

## ORDER

Presently before the Court is Defendants' Motion for Summary Judgment. [Dkt. 105.]

### I.
#### SUMMARY JUDGMENT STANDARD

A motion for summary judgment asks that the Court find that a trial based on the uncontroverted and admissible evidence would—as a matter of law—conclude in the moving party's favor and is thus unnecessary. Fed. R. Civ. Pro. 56(a), (c)(2). When evaluating a motion for summary judgment, the Court must give the non-moving party the benefit of all reasonable inferences from the evidence submitted and resolve "any doubt as to the existence of a genuine issue for trial...against the moving party." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986). Nevertheless, "the Court's favor toward the non-moving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010) (quotation and alteration omitted). The key inquiry concerns the existence of evidence to support a plaintiff's claims, not the weight or credibility of that evidence—both of which are assessments reserved to the trier of fact. *See Schacht v. Wis. Dep't of Corrections*, 175 F.3d 497, 504 (7th Cir. 1999) ("Roughly speaking, [summary judgment] is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a

trier of fact to accept its version of events."); *Walter v. Fiorenzo*, 840 F.2d 427, 434 (7th Cir. 1988) ("A motion for summary judgment cannot be defeated merely by an opposing party's incantation of lack of credibility over a movant's supporting affidavit."); *see also Caisse Nationale de Credit Agricole v. CBI Indus.*, 90 F.3d 1264, 1270 (7th Cir. 1996) ("A party seeking to defeat a motion for summary judgment is required to wheel out all its artillery to defeat it." (quotation omitted)).

## II.
### UNDISPUTED MATERIAL FACTS

Plaintiff Loparex, LLC and Defendant MPI Release Technologies, LLC ("MPI"), are competitors in the "release liner" industry. [Dkt. 110 ¶3.] Defendants Stephan Odders and Gerald Kerber are former Loparex employees that went to work for MPI.[1] The circumstances surrounding their change of employment give rise to this action.

As indicated above, summary judgment is the time for evidentiary proof, not conjecture. *See also Haskins v. New Venture Gear*, 2002 U.S. Dist. LEXIS 4552, *19 (S.D. Ind. 2002) ("Motions for summary judgment must be decided on the record as it stands, not on a litigant's visions of what the facts might some day reveal...." (quotation omitted)). Nonetheless Loparex has offered factual assertions in its brief that are unsupported with citations to admissible evidence. [*See, e.g.*, dkt. 196 at 3 (accusing MPI of using Loparex trade secrets to "jumpstart" its production, without offering any evidence of that claim).] As required, the Court has ignored such unsupported statements and focused only on the evidentiary proof when ascertaining the undisputed facts that follow. *See* Fed. R. Civ. Pro. 56(c)(1)(A) ("A party asserting that a fact…

---

[1] At various times the evidence describes the individuals as working for either MPI or for its parent, Metallized Products, Inc. [*Compare, e.g.*, dkt. 107-3 at 3, *with* dkt. 113 ¶2.] As the parties have done for simplicity, the Court generally won't distinguish between the two affiliates here.

is genuinely disputed must support the assertion by…citing to particular parts of materials in the record….").

## A. The Release Liner Industry

The release liner industry makes "products that have…a releasable attachment to a base material or substrate. Familiar examples are nametags with a peel-off backing so that they can be releasably attached to clothing and computer mailing labels." [Dkt. 110 ¶3]

To make the substrate for a given coating, firms mix elements based upon a formula. [*Id.* ¶5.] "These formulas are developed by in-house R&D departments, and are sometimes the product of collaborative efforts between the release liner manufacturers and their customers and/or chemical suppliers." [*Id.*] Each formula also depends on which of the three methods will be used to apply the coating to the substrate: "(i) ultraviolet (UV), (ii) electron beam (EB), and thermal. Thermal curing refers to drying the coating to the substrate with hot air in an oven." [*Id.* ¶4.] A formula for one application method won't work if another method is used. [*Id.* ¶5.]

## B. Loparex

Headquartered in Illinois, [dkt. 26], Loparex makes and sells release liners. It has spent "millions of dollars and years worth of hard work" to develop its products. [Dkt. 199-6 ¶5.] Accordingly, it "guards carefully" its formulas and production process, not disclosing them "to others, including its customers." [*Id.*] It also "ke[eps] secret" its client files, pricing information, and marketing strategies. [*Id.* ¶8.]

If any evidence in the large record exists about any changes to Loparex's sales volume or profitability during the time relevant to this action, the parties haven't pointed the Court to it.

**C. MPI**

While Massachusetts-based Metallized Products, Inc., had historically manufactured EB-and UV-cured release-liner products, it had outsourced the manufacture of thermal-cured products.  [Dkt. 110 ¶¶5-6.]  In November 2008, it learned of a thermal coater available for sale in Greenwood, Indiana, a facility and machine that would eventually be bought by its affiliate, MPI.  [*Id.* ¶¶8, 13.]

If any evidence in the record exists to show similarities between the formulas MPI uses at its facility and those that Loparex uses, the parties haven't directed the Court to it.

**D. Mr. Odders**

Beginning in 2006, Mr. Odders worked for Loparex in sales.  He managed a sales team that, according to him, primarily targeted "Arizona, California, Delaware, Florida, Georgia, Kansas, Missouri, New Mexico, North Carolina, Oklahoma, Pennsylvania, South Carolina, and Texas."  [Dkt. 113 ¶¶3-4.]  Although Loparex has submitted an affidavit describing Mr. Odders as overseeing "all release liner sales," [dkt. 199-6 ¶6], it hasn't attempted to specify the territories falling under Mr. Odders' responsibilities.

As a condition of his employment, Loparex required Mr. Odders to sign a "Sales Confidentiality/Non-Competition Agreement."  [Dkt. 113 ¶¶3.]  As discussed in detail later, that agreement required him in relevant part to forgo soliciting Loparex customers and to forgo soliciting or performing work that competed with Loparex in any territory that had been assigned to him within one year before his departure.  [Dkt. 113-1 at 3.]  Those obligations would last for one year, "irrespective of the time, manner or cause of termination."  [*Id.*]  That termination ultimately happened on September 11, 2008, when Loparex fired Mr. Odders.  [Dkt. 113 ¶5.]

Mr. Odders contacted Mr. Alois, MPI's president (and other potential employers) shortly after being fired. He wanted to indicate that he would be available for employment upon the expiration of his non-competition agreement. [*Id.* ¶6.] Through a written agreement, Mr. Odders eventually granted MPI essentially the right of first refusal to hire him as a sales manager upon the expiration of the Loparex non-competition agreement, "pursuant to the terms and conditions set forth in the Employment Agreement attached hereto as Exhibit A." [Dkt. 67-1 at 1.] In exchange, Mr. Odders promised to forebear accepting employment with someone else in the interim that would prevent him from working for MPI. [*Id.*]

Mr. Odders and MPI have been unable to locate and produce the "Exhibit A" referenced in the contract. [Dkt. 199-2 at 24.] But Mr. Odders has, by affidavit, averred that he "performed no employment duties for [MPI] and was not paid by [MPI] prior to beginning [his] employment in late September, 2009." [Dkt. 113 ¶8.]

While waiting for his non-competition agreement with Loparex to expire, Mr. Odders met with Mr. Alois several times, including once in March 2009 at the Greenwood facility that MPI would later purchase, and once in Florida for a game of golf. [*Id.* ¶9.]

### E. Mr. Kerber

Mr. Kerber began working for Loparex in the summer of 2006 as an engineering manager. [Dkt. 112 ¶5.] In that capacity, he had access to Loparex's formulas, learned about its production processes and about how to operate and maintain Loparex's curing machinery. [Dkt. 199-6 ¶4.] Very few people in the U.S. know how to operate these machines. [*Id.*]

Mr. Kerber resigned his job at Loparex on September 18, 2009, to go manage MPI's Greenfield plant. [Dkt. 112 ¶7.] Within a week after his resignation, Mr. Kerber destroyed the notebooks that he kept during his employment at Loparex. [*See* dkt. 199-1 at 143.]

The first time that Loparex ever asked Mr. Kerber about his notebooks was in May 2010, approximately six months after this action began and approximately three months after Loparex had filed its Amended Complaint. [*See* dkt. 196 at 24.]

### III.
#### PRIOR FINDING OF NON-SPOLIATION

In its response to Defendants' motion for summary judgment, Loparex argued that Defendants' spoliation of evidence gave rise to an adverse inference, foreshadowing a motion for sanctions it filed after it filed its summary judgment response. [*See* dkt. 196 at 2 n.1.]

In connection with the sanctions motion, the Court held an evidentiary hearing on the spoliation issue. As is relevant here, the Court made the following findings of fact: [2]

- The "Exhibit A" to Mr. Odders' contract with MPI was never executed or otherwise made a part of the agreement. [Dkt. 270 at 5-6.]

- Mr. Kerber reasonably and in good faith believed that he owned the composition-style notebooks that he had a habit of keeping while at Loparex, in which he recorded both personal and business notes to himself. Within one week of his resignation, Mr. Kerber destroyed his two remaining notebooks because he believed that he no longer needed them, inasmuch as he was no longer a Loparex employee. [*Id.* at 3.]

---

[2] Because no party demanded a jury, the Court would operate as the finder of fact at any trial, as it was at the evidentiary hearing. But apart from the facts set forth above, which were necessary to resolving the prior motion, the Court's decision here rests only upon the evidence that the parties designated in connection with the motion for summary judgment, viewed in the light most favorable to Loparex as the non-moving party. *See* Fed. R. Civ. Pro. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."). Considering items not cited by either party deprives the parties a chance to offer argument or rebuttal evidence.

- In connection with his and/or his family's move from Wisconsin to Indiana, Mr. Kerber inadvertently lost a portable hard drive at some point that he had used before leaving Loparex. [*Id.* at 4.]

For the reasons set forth in the Court's prior ruling, [*see id.*], no adverse evidentiary inference is appropriate. Accordingly, none will be applied here: Loparex won't be excused from its burden of producing admissible evidence to defeat Defendants' motion for summary judgment.

## IV.
### DISCUSSION

Loparex has asserted five causes of action. It alleges that the Defendants have each violated the Uniform Trade Secrets Act ("UTSA"); committed common-law conversion, committed various criminal acts compensable under Indiana's Crime Victim Relief Act, Ind. Code § 34-24-3-1; and tortiously interfered with Loparex's business relationships. [*See* dkt. 76.] Additionally, Loparex alleges that Mr. Odders has breached his non-competition agreement. [*Id.*]

### A. UTSA

#### 1. *Choice of Law*

The National Conference of Commissioners on Uniform State Laws has promulgated several model statutes recommended for adoption by the states, including the UTSA. http://www.law.upenn.edu/bll/ulc/fnact99/1980s/utsa85.htm (last visited March 25, 2011). When states chose to adopt model statutes they can, and sometimes do, enact slightly different versions from the model statutes. But even if two states adopt the same text, each state's supreme court can interpret the text differently.[3] Here, both Illinois and Indiana have adopted

---

[3] This Court has diversity jurisdiction over this action. Accordingly, the Court must predict how the supreme court of the state whose substantive law governs "would rule decide the case, and decide it the same way." *Mindgames, Inc. v. W. Publ'g Co.*, 218 F.3d 652, 655-656 (7th Cir. 2000) (citations omitted).

slightly different versions of the UTSA. *Compare, e.g.*, Ind. Code § 24-2-3-1(c) (preemption provision), *with* 765 Ill. Comp. Stat. § 1065/8 (differently worded preemption provision). Before the Court can decide whether Loparex can potentially establish a violation of the UTSA, the Court must first decide which state's version of the UTSA applies.

Indiana's choice-of-law principles govern this Court in diversity actions like this one. *Storie v. Randy's Auto Sales, LLC*, 589 F.3d 873, 879 (7th Cir. 2009) ("Because the district court's subject matter jurisdiction was based on diversity, the forum state's choice of law rules determine the applicable substantive law." (citation omitted)). Defendants' opening brief explains and applies those principles in almost two full pages. [*See* dkt. 106 at 23-24.] Among other things, Defendants say that Illinois trade-secret law should govern because Loparex has its headquarters there, [dkt. 76 ¶2], so that is where any harm would be felt. [Dkt. 106 at 24]; *accord Micro Data Base Sys., Inc. v. Dharma Sys., Inc.*, 148 F.3d 649 (7th Cir. 1998) (applying Indiana choice-of-law principles in a trade-secret case and holding that New Hampshire substantive law governs because the entity holding the trade secrets was headquartered there). Loparex offers no response to that choice-of-law analysis; it fails to make any mention of the issue. [*See* dkt. 196.][4] The Court interprets Loparex's silence as an acknowledgement of the merit of Defendants' argument, justifiably presuming that it would have presented contrary arguments if it had them. *Greenlaw v. United States*, 554 U.S. 237, 243-244 (2008) ("[W]e rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present….Our adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief."

---

[4] In reply, Defendants pointed out Loparex's silence on the choice-of-law issue, as well as its silence on any damages that it suffered and on the scope of preclusion under the UTSA—both of which are discussed later. [*See* dkt. 211 at 13-15.] Even when confronted with such a charge, Loparex didn't seek leave to file a surreply.

(quotation, alteration, and citations omitted)).  And in any event, because the Court independently finds that the Defendants have accurately undertaken the choice-of-law analysis, the Court will apply Illinois substantive law.

### 2.  *Applying Illinois Law*

To establish a violation of Illinois' UTSA, Loparex must prove three elements:

- That it has information qualifying as a trade secret;

- That at least one of its trade secrets has been misappropriated; and

- That the Defendant(s) used that trade secret in their business or inevitably will.

*Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 721 (7th Cir. 2003) (collecting cases); *Sys. Dev. Servs. v. Haarmann*, 907 N.E.2d 63, 72 (Ill. App. Ct. 2009) (citation omitted); *Strata Mktg. v. Murphy*, 740 N.E.2d 1166, 1178 (Ill. App. Ct. 2000) (recognizing inevitable use). The Court will discuss each of the three required elements here in turn.

### a.  *Loparex's Designation of Trade Secrets*

For the purposes of the statute, information must meet two criteria to count as a trade secret:  It must (1) be "sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) [be] the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality."  765 Ill. Comp. Stat. 1065/2(d).

Plaintiffs are often reluctant to disclose exactly which information meets the statutory definition of a trade secret, for "the more precise the claim, the more a party does to tip off a business rival to where the real secrets lie and where the rival's own development efforts should be focused."  *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 583 (7th Cir. 2002).  But reluctant or not, "plaintiff[s] must show concrete secrets" to survive summary judgment; "[i]t is not enough to

point to broad areas of technology and assert that something there must have been secret…." *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir. 1992) (Illinois law) (citation omitted).  That required showing is often "hard."  *IDX*, 285 F.3d at 584.[5]

Here, Loparex claims to have articulated its relevant trade secrets in three places:  in its supplemental response to MPI's First Request for Production, Request Number 2, [dkt. 199-9]; in its supplemental response to MPI's Third Request for Production of Documents, Request Number 1, [dkt. 199-10]; and in the Affidavit of James Miksta, [dkt. 199-6].  The Court finds otherwise.

With respect to the responses to the two document requests, filed as Exhibits L and M, Loparex has impermissibly attempted to shift to the Court Loparex's burden to sufficiently describe its trade secrets.  *See IDX*, 285 F.3d at 584 ("IDX's tender of the complete documentation for the software leaves mysterious exactly which pieces of information are the trade secrets….[A] plaintiff must do more than just identify a kind of technology and then invite the court to hunt through the details in search of items meeting the statutory definition."  (citation omitted)).

Exhibit L contains twenty pages of formulas and machine operating settings.  [Dkt. 199-9.]  Nothing in the exhibit explains why the specific formulas and settings represent economic value for Loparex, or how Loparex keeps them confidential—even though evidence of both is statutorily required for information to count as a trade secret.  765 Ill. Comp. Stat. 1065/2(d).[6]  *See also Cent. Ill. Light Co. v. Consolidation Coal Co.*, 349 F.3d 488, 493 (7th Cir. 2003) (explaining that statements contained in briefs "are not evidence").  With respect to the formulas in

---

[5] Indeed, to ever obtain the injunctive relief Loparex seeks, [*see* dkt. 76 at 19 ¶a], Loparex would also need to be able to specify the trade secrets that would be subject to an injunction.  *See Patriot Homes, Inc. v. Forest River Hous., Inc.*, 512 F.3d 412, 415 (7th Cir. 2008) (vacating preliminary injunction as violating the specificity requirement of Fed. R. Civ. Pro. 65(d) where the order failed to articulate the information qualifying as a trade secret).

[6] If other evidence could somehow be read to link up Exhibit L with the statutory requirements, Loparex didn't direct the Court to it in the briefing.

particular, Loparex argues that "[a]s many of those documents [in Exhibit L] include the explanation that it is a 'recommended formula' or a coating for a particular product, it is impossible to characterize the documented information as anything other than a trade secret." [Dkt. 196 at 16.] Apparently Loparex believes that no further evidentiary showing is required. In fact one is, especially given that Defendants have introduced evidence that customers sometimes work with suppliers to develop formulas, [*see* dkt. 110 ¶5]. *Van Der Woude*, 962 F.2d at 1265 (explaining that Illinois law doesn't count as a trade secret information "generally known in the industry"). But setting aside the lack of legal authority that would excuse an evidentiary showing, the Court's own review of Exhibit L reveals only two formulas that are explicitly characterized as "recommendations." [Dkt. 199-9 at 3, 5.] So even under Loparex's view, it's unclear how the other formulas possibly qualify as trade secrets.

Exhibit M, consisting of supplier quotations and related correspondence, doesn't fare any better. Again, no affidavit attests to economic value that the specific information contained in the Exhibit represents to Loparex. Further, it offers no response to the Illinois authority—cited in Defendants' opening brief, [dkt. 106 at 27]—that such pricing information can't satisfy the confidentiality requirements for a trade secret. *See Carbonic Fire Extinguishers, Inc. v. Heath*, 547 N.E.2d 675, 678 (Ill. App. Ct. 1989) ("The pricing information here, unlike a unique formula used to calculate a price but unknown to a customer or competitors was available to the various customers to which it pertained. As such, those customers were at liberty to divulge such information to a competitor of plaintiff's, or to anyone for that matter." (citation omitted)).

Loparex's third source of trade secret designations, Mr. Mitksa's eight-paragraph affidavit, insufficiently describes—with one possible exception—any actionable trade secrets. The affidavit is impermissibly conclusory, for example claiming that Loparex has a trade secret in its

"capacity and methods to coat specific products for customers," [dkt. 199-6 ¶4(a).] Conclusory affidavits never suffice to defeat summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) ("The object of [summary judgment] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." (citation omitted)). Especially in the context of trade secrets, where the Court must separate information that meets the statutory criteria for protection from information that does not, specificity about the scope of the trade-secret claim is essential. *See IDX*, 285 F.3d at 584 (rejecting claim that forty-three page description of software was specific enough because "it does not separate the trade secrets from the other information that goes into any software package" and thus fails to indicate "[w]hich aspects are known to the trade, and which are not"). [7]

The closest that Mr. Mitksa's affidavit comes to providing fair notice of what trade secrets are at issue in this action is the statement that "Mr. Kerber had knowledge of…Loparex's proprietary Poly Formula for the FLEXcon EX liner, including knowledge of the proprietary additive on the matte side of this liner and the process for producing it." [Dkt. 199-6 ¶4(c).] But even that description still runs afoul of the rule that "[t]he identification of a trade secret requires more than categorizing information as a 'formula' or 'secret.'" *Hypred S.A. & A & L Labs., Inc. v. Pochard*, 2004 U.S. Dist. LEXIS 11293, *14 (D. Minn. June 18, 2004). Calling portions of it

_____

[7] Further, insofar as the affidavit attempts to conclusorily designate as a trade secret Mr. Kerber's knowledge about how to operate equipment, [*see* dkt. 199-6 ¶4(e)], that attempt runs afoul of Illinois law, which refuses to recognize as a trade secret any "general skills and knowledge acquired in the course of employment." *AMP, Inc. v. Fleischhacker*, 823 F.2d 1199, 1205 (7th Cir. 1987) (explaining that "[a]ny other rule would force a departing employee to perform a prefrontal lobotomy on himself or herself" and "would disserve the free market goal of maximizing available resource to foster competition" (quotation omitted)). And insofar as Loparex attempts to claim as a trade secret Mr. Odders' knowledge of Loparex's profit margins, [*see* dkt. 199-6 ¶7(g)], that claim also misses the mark. *Stenstrom Petroleum Servs. Group, Inc. v. Mesch*, 874 N.E.2d 959, 974 (Ill. App. Ct. 2007) ("We reject Stenstrom's argument that its profit margin is a trade secret." (citation omitted)).

"proprietary" doesn't help either. *Cf. Cook Inc. v. Boston Sci. Corp.*, 206 F.R.D. 244, 248 (S.D. Ind. 2001) (discussing standards for confidentiality designations under Fed. R. Civ. Pro. 26(c) and noting that "'proprietary data' is too vague" of a definition of trade secrets). The description doesn't distinguish, as required, those portions of the formula and production process that are "readily observable," from those that aren't; only the later are protected (assuming the other statutory requirements are met). *Cf. Cooper v. Dep't of the Lottery*, 640 N.E.2d 1299, 1307 (Ill. App. Ct. 1994) (interpreting trade-secret exemption of the Illinois Freedom of Information Act).

In connection with Loparex's (aborted) pursuit of a preliminary injunction, the Court warned Loparex about the need for it to specify the trade secret or secrets it claims are at issue in this action. [*See* dkt. 86 at 8 (encouraging Loparex to narrow its broad trade-secret claims because "you have to be able to say what it is specifically that [Mr. Kerbers and Mr. Odders] carried into MPI Release's operations for it to be misappropriation of trade secrets….").] At present, however, Loparex still has failed to set forth its trade secrets. Because "[m]otions for summary judgment must be decided on the record as it stands, not on a litigant's visions of what the facts might some day reveal," *Haskins v. New Venture Gear*, 2002 U.S. Dist. LEXIS 4552 *19 (S.D. Ind. 2002) (quotation omitted), Loparex has run out of time to pin down its trade secrets. The Defendants are entitled to summary judgment on Loparex's trade-secrets claim.[8]

---

[8] While the Court has found that no spoliation has occurred, the Court notes that Loparex's requested adverse inference, if applied, still wouldn't preclude summary judgment. Loparex has cited no authority to suggest that an adverse inference could excuse it from proving that it possessed at least one protected trade secret that the Court could infer was disclosed to MPI. *See 3M v. Pribyl*, 259 F.3d 587, 606 n.3 (7th Cir. 2001) ("[T]he fact that hard drive space was destroyed on Pribyl's computer does not relieve 3M of having to prove the elements of its claims. 3M has not suggested how the evidence it believed it would have received from the computer would have impacted its misappropriation claim.").

### b.  Loparex's Evidence of Misappropriation

The misappropriation element of a trade-secret claim requires a plaintiff to show that its trade secret was "stolen…rather than [having been] developed independently or obtained from a third source [by the defendants]."  *Composite Marine*, 962 F.2d at 1266.

As an initial matter, the Court notes that Loparex has offered absolutely no argument that Mr. Odders has misappropriated any trade secrets that Loparex believes it has.  [*See* dkt. 196 at 10-11, 18-24 (discussing only information allegedly given to MPI by Mr. Kerber).]  Thus, whether or not Loparex had any statutorily protected trade secrets, its claim against Mr. Odders would fail here at the second element as well.

With respect to Mr. Kerber and MPI, however, Loparex has offered argument of misappropriation.  But in support of that argument, Loparex has cited essentially the same evidence that it contended merited an adverse evidentiary inference at trial.  [*See generally* dkt. 196 at 19-24.]  To resolve Loparex's sanctions motion, the Court held an evidentiary hearing and ultimately ruled that Loparex's evidence didn't support any adverse inference, including one of misappropriation.  [*See* dkt. 270.]

### c.  Loparex Evidence of Trade-Secret Use

Even assuming—despite the Court's findings to the contrary above—that Loparex had properly designated at least one trade secret and also had presented evidence that it had been misappropriated, the Court still would grant Defendants summary judgment because Loparex failed to establish the third element of its claim:  the Defendants' use of a misappropriated trade secret.  Loparex's argument that MPI "jumpstarted" its production with the help of misappropriated trade secrets, [dkt. 196 at 3], is supported by absolutely no evidence.  For example, Loparex hasn't pointed to any new product that MPI has developed that resembles any Loparex product.

*See Kim v. Dawn Food Prods.*, 2006 U.S. Dist. LEXIS 11033, *19 (N.D. Ill.) (granting summary judgment to trade-secrets claim because "Kim's contention that Dawn Food Products changed its earlier produced formulas to incorporate her trade secrets is not supported by the record"), *aff'd* 206 Fed. Appx. 558 (7th Cir. 2006).  Given the years that have already passed since this action began without use and given the lack of any evidence of new product plans, Loparex also hasn't shown inevitable use either.

## B. Conversion

To the extent that Loparex has sued the Defendants for common-law conversion/theft of "Loparex's proprietary information, i.e., its trade secrets," [dkt. 196 at 27], that claim impermissibly conflicts with Illinois' UTSA.  The Illinois General Assembly has determined that the UTSA preempts common-law causes of action, other than for breach of contract, involving the "misappropriation of a trade secret."  765 Ill. Comp. Stat. 1065/8(a).  *Accord Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1265 (7th Cir. 1992) ("Illinois has abolished all common law theories of misuse of [trade secret] information."  (citing Illinois UTSA)).  Illinois law doesn't permit plaintiffs to claim conversion of trade secrets, which is what Loparex seeks to do.  *See AutoMed Techs., Inc. v. Eller*, 160 F. Supp. 2d 915, 922 (N.D. Ill. 2001) (finding a conversion claim preempted by the Illinois UTSA because the "claim is really just another way of charging that defendants took AutoMed's secret information").

To the extent, if any, that Loparex's conversion claim seeks to recover the chattel value of the notebooks that Mr. Kerber destroyed—i.e. their value excluding any trade secrets they might have contained—Loparex's claim still fails.[9]  First, Loparex hasn't identified any evidence

---

[9] Loparex makes no argument that any other type of intellectual property was contained in the notebooks other than its trade secrets. [*See* dkt. 226 at 8 ("The[] log books were created in the course of [Mr. Kerber's employment] and at the expense of Loparex, and constitute trade secret

that it owned the actual notebooks (as opposed to any alleged trade secrets contained in them) that Mr. Kerber destroyed, a required element of conversion. *See Cirrincione v. Johnson*, 703 N.E.2d 67, 70 (Ill. 1998) ("[A] plaintiff must establish that (1) he has a right to the property; (2) he has an absolute and unconditional right to the immediate possession of the property; (3) he made a demand for possession; and (4) the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property." (citation omitted)). Second, Loparex didn't ask for the notebooks back before filing the conversion claim, as required, *see id.* Instead, it waited three months after filing its Amended Complaint before ever mentioning them, [*see* dkt. 196 at 24], meaning that the notebooks necessarily weren't included in the property Loparex claimed had been converted in either the Complaint or the Amended Complaint. Finally, because Loparex's damages on this count can't include the value of the trade secrets contained in the notebooks, any remaining damages from its former employee's destruction of two used notebooks may be so nominal as to preclude legal relief. *See People v. Durham*, 915 N.E.2d 40, 42 (Ill. App. Ct. 2009) ("The maxim *de minimis non curat lex* ('The law does not concern itself with trifles') retains force in Illinois…." (citation omitted)).

### C. Indiana's Crime Victim's Relief Act

Loparex has also sued the Defendants under an Indiana law known as the Crime Victim's Relief Act, which permits victims of certain property crimes who have suffered a "pecuniary loss" to recover treble damages from the perpetrator. Ind. Code § 34-24-3-1. Loparex's claim ultimately fails, however, for two reasons. First, as indicated above, Illinois substantive law controls here, not Indiana law. Loparex has identified no comparable Illinois statute to Indiana's

---

information." (citation omitted)); 246 at 5 ("[T]he logbooks contained highly confidential, proprietary, trade secret information.").] The UTSA is, therefore, the only relevant body of intellectual property law, given the preclusion provision.

Crime Victim Relief Act. Second, even if Indiana law applied, Loparex's failure to present any evidence of damages resulting from Defendants' conduct means that it has failed to establish the required "pecuniary loss" under the Crime Victim's Relief Act. *Cook Biotech, Inc. v. Acell, Inc.*, 2005 U.S. Dist. LEXIS 41163, *13 (N.D. Ind. 2005) (granting summary judgment on claim under the Crime Victim's Relief Act where the plaintiff offered only a conclusory affidavit to establish the value of the pecuniary loss).

### D. Tortious Interference with Loparex's Business Relationships

Next, Loparex contends that the Defendants have tortiously interfered with its "clients and/or prospective clients." [Dkt. 76 ¶83.] Under Illinois law, this cause of action requires Loparex to prove the following four elements: "(1) it had a valid business relationship or expectation of entering into a valid business relationship; (2) [Defendants] knew of that relationship or expectancy; (3) [Defendants] intentionally interfered, inducing or causing a breach or termination of the relationship or expectancy; and (4) [Loparex] suffered damages as a result." *Labor Ready, Inc. v. Williams Staffing. L.L.C.*, 149 F. Supp. 2d 398, 410 (N.D. Ill. 2001) (citation omitted). Although Defendants challenged Loparex to come forward with any evidence of damages that it may have suffered, [dkt. 106 at 35], Loparex failed to designate any evidence about any damages it claims to have suffered. Absent evidence that Loparex actually lost at least one actual or potential customer, Loparex necessarily can't establish tortious interference because it has suffered no damages.[10]

---

[10] Given that Loparex knows who its customers are—and should presumably know if it lost any of them—an adverse inference of disclosure of trade secrets to MPI wouldn't excuse Loparex's inability to show damages.

### E. Non-competition Agreement

Under Illinois law, which controls Mr. Odders' non-competition agreement, [dkt. 113-1 ¶6], an action for breach of contract requires proof of four elements: "(1) the existence of a contract; (2) a breach of the contract by the defendant; (3) plaintiff's performance of all conditions; and (4) damages to plaintiff as a consequence." *Shapiro, Olefsky & Co. v. Cohen*, 2003 U.S. Dist. LEXIS 12018, *7 (N.D. Ill. 2003) (citation and footnote omitted) (applying Illinois law in the context of breach of non-competition agreement). Here, Mr. Odders argues that summary judgment in his favor should issue because Loparex has no proof that he breached his Agreement and, even if he did, that Loparex suffered any damages because of it.

#### 1. Breach

Absent an ambiguity in the terms the parties used in their written contracts—and no one claims that the Agreement is ambiguous—the Court must give contractual terms their "ordinary and natural meaning," *Hot Light Brands, L.L.C. v. Harris Realty Inc.*, 912 N.E.2d 258, 263 (Ill. App. Ct. 2009) (citation omitted). Illinois law presumes that the parties "purposefully" chose each word in a contract, "and the language employed is to be given effect." *Regency Comm'l Assocs., LLC v. Lopax, Inc.*, 869 N.E.2d 310, 316 (Ill. App. Ct. 2007) (citation omitted).

Loparex's response brief, [dkt. 196 at 29-30], quotes the following prohibitions from the Agreement that remained in effect until September 2009:

- "I will not either directly or indirectly, either as a principal, agent, employee, employer, partner or shareholder…or in any other capacity, solicit or engage in Company Business with any customer who was a customer, or a prospective customer...within the twelve (12) months immediately preceding my termination." [Dkt. 113-1 at 3.]

- "I will not, directly or indirectly, either as [a] principal, agent, employee, employer, partner, shareholder…or in any other capacity engage in, solicit or perform any work com-

petitive with Company business in any territory assigned to me by Company within the twelve months preceding my termination. [*Id.*]<sup>11</sup>

Despite quoting those two prohibitions, Loparex hasn't identified any actual evidence that Mr. Odders violated them.

As to the first, Mr. Odders has denied under oath contacting any customers during the one-year cooling-off period. [Dkt. 113 ¶8.] Mere second-hand rumors of earlier contacts, [*see* dkt. 108-1 at 14], don't count on summary judgment (or at trial for that matter). *See* Fed. R. Evid. 802 (prohibiting hearsay); Fed. R. Civ. Pro. 56(c)(2) (requiring that facts used to oppose summary judgment be "presented in a form that would be admissible in evidence").

As to the second, Mr. Odders has likewise sworn that he "performed no employment duties for [MPI] and was not paid by [MPI] prior to beginning employment in late September, 2009." [Dkt. 113 ¶8.] While Loparex cites a string of meetings between Mr. Odders and MRI, meetings which Loparex says "appear[]" to show that he began working before that time, [dkt. 196 at 32], Loparex is silent as to the type of work it claims Mr. Odders was performing. But whether or not Mr. Odders was working for MPI isn't the issue here in any event. The issue is whether any work involved "competiti[on]…in any territory assigned to [him] by [Loparex] within the twelve months preceding [his] termination." [Dkt. 113-1 at 3.]

Mr. Odders has denied that he had any assigned territory, because he merely managed salespeople rather than actually performing sales himself. [Dkt. 106 at 38.] Loparex hasn't at-

---

<sup>11</sup> Loparex's brief also quotes the Agreement's prohibition, unlimited as to time, of disclosing Loparex's trade secrets to its competitors. [*Id.*] Loparex doesn't, however, make any specific argument about how Mr. Odders might have breached that prohibition. To the extent that the prohibition is co-extensive with the protection that the law already provides to trade secrets, the Court finds no breach, for the reasons explained earlier. To the extent, if any, that the Agreement contains more restrictive protections, the Court finds that Loparex has waived any claim to them for failure to develop them with cogent argument. *See, e.g.*, *In re Aimster Copyright Litig.*, 334 F.3d 643, 656 (7th Cir. 2003) (deeming under-developed arguments waived).

tempted to dispute that argument, thereby forfeiting the point. [*Compare* dkt. 106 at 38, *with* dkt. 196 at 29-33.][12] Thus, absent evidence of actually performing or soliciting competitive work within the restricted territory—evidence lacking here—Loparex can't survive summary judgment on its breach-of-contract claim against Mr. Odders.

## 2. Damages

In his opening brief, Mr. Odders contends that Loparex has suffered no damages from any alleged breach of his Agreement, challenging Loparex to come forth with any evidence to the contrary. [Dkt. 106 at 21, 31-32.] Loparex offered no evidence in response, failing to rise to Mr. Odders' challenge. Loparex's inability to designate evidence to support its allegations of damages also entitles Mr. Odders to summary judgment on Loparex' breach-of-contract claim. *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 631 (7th Cir. 2007) ("[U]nder Illinois law, it is necessary to show damages—not the specific amount, but rather that the plaintiff did, in fact, suffer some damages. Merely showing that a contract has been breached without demonstrating actual damage does not suffice, under Illinois law, to state a claim for breach of contract." (citations and footnote omitted)).[13]

---

[12] To the extent that Mr. Odders' assigned territory could be deemed co-extensive with the territories assigned to the salespeople he supervised, only one of the meetings Loparex cites occurred within that territory: "In April 2009, Messrs. Odders and Alois [Metallized's president] met in Florida and played a round of golf with another MPI employee." [Dkt. 196 at 31 (citations omitted).] Loparex offers no explanation for how golf might be viewed as work. Nor does it explain what was said during any of the meetings that might be construed as soliciting work competitive with Loparex in Mr. Odders' territory.

[13] Even assuming that Loparex were correct that Mr. Odders hasn't produced a complete copy of the employment contract with MPI—despite the Court's finding to the contrary in the sanctions ruling—Loparex again seeks too much from its requested adverse inference. Loparex offers no explanation as to why any missing portions were needed to prove that Loparex has suffered harm from whatever breach(es) Loparex believes Mr. Odders committed, rather than showing mere breach. Evidence of damages, if any exits, is most likely to be in Loparex' own possession. None was presented here, despite the need for Loparex "to wheel out all its artillery to defeat" summary judgment. *CBI Indus.*, 90 F.3d at 1270.

# V.
## CONCLUSION

Where, as here, the defendants move for summary judgment, the plaintiff must "put up or shut up," *Schacht*, 175 F.3d at 504—in other words, either bring forth evidence to support its allegations or else have judgment entered against it. Loparex hasn't come forth with the required evidence. Defendants' motion for summary judgment, [dkt. 105], is therefore **GRANTED**.

03/25/2011

_____
Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only**:

Lisa A. Baiocchi
JACKSON LEWIS LLP
lisa.baiocchi@jacksonlewis.com

Donald E. Knebel
BARNES & THORNBURG LLP
donald.knebel@btlaw.com

Michael W. Padgett
JACKSON LEWIS LLP
padgettm@jacksonlewis.com

Charles W. Pautsch
JACKSON LEWIS LLP
charles.pautsch@jacksonlewis.com

Jennifer Lynn Schuster
BARNES & THORNBURG LLP
jschuster@btlaw.com

Lawrence Bryant Shulman
JACKSON LEWIS LLP
shulmanl@jacksonlewis.com

Aaron M. Staser
BARNES & THORNBURG LLP
aaron.staser@btlaw.com

Lynn C. Tyler
BARNES & THORNBURG
lynn.tyler@btlaw.com

Melissa S. Vare
JACKSON LEWIS LLP
varem@jacksonlewis.com

Richard P. Winegardner
BARNES & THORNBURG LLP
rwinegar@btlaw.com